# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of: ) | DIVISION ONE |
| ) | |
| HARRY GEORGE NIWRANSKI, ) | No. 71624-7-I |
| ) | |
| Respondent, ) | UNPUBLISHED OPINION |
| ) | |
| and ) | |
| ) | |
| LAURA LEE NIWRANSKI, ) | |
| ) | |
| Appellant. ) | FILED: April 27, 2015 |
| _____ ) | |

DWYER, J. — Harry Niwranksi filed a petition for the dissolution of his marriage to Laura Niwranski. Approximately two years later, the trial court entered a final decree of dissolution as well as final orders regarding property distribution, maintenance, and parenting. Laura now appeals from those orders, alleging that the trial court abused its discretion with regard to the property division and parenting orders and that she was denied the effective assistance of counsel. Because she does not establish an entitlement to relief on any of her claims, we affirm.

I

Harry Niwranksi and Laura Niwranski were married on June 16, 2000. The parties separated for the first time in May 2009, and Laura filed a petition for dissolution. They reconciled in March 2011 and the dissolution action was dismissed. The parties separated for the final time on November 11, 2011, and

Harry filed the underlying second petition for dissolution. The parties have two children, a daughter now age 14 and a son now age 12.

Harry had been working in aviation for many years when he met Laura. At age 20, Harry began working as a licensed aircraft mechanic for Okanogan Helicopters, where he worked for many years. He started a helicopter parts company in 1986 or 1987 after noticing there were few companies specializing in helicopter parts. While continuing to work nights as a mechanic, Harry formed Helicopter Parts International (HPI) and was granted a distributor license in Canada to sell new, used, commercial, and military helicopter parts. Harry's previous contacts through Okanogan Helicopters facilitated HPI's growth, allowing Harry to quit his night job and focus on his business.

In approximately 1990, Harry decided HPI would have greater growth potential if he moved his business to the United States. Harry relocated and incorporated HPI in Washington State in 1991, building his first "compound" for the business on a five-acre property in Blaine, Washington. In 1997, Harry formed Aviation Component Services (ACS), which holds a Federal Aviation Administration (FAA) repair station certification and owns an FAA-certified facility near the Blaine airport that it rents to HPI. As of trial, approximately 80 percent of HPI's work involved government contracts.

Laura was working as a dental hygienist in British Columbia when she met Harry. Laura quit that job after becoming pregnant with the parties' first child. Even though she had no background or training in that field, HPI eventually hired Laura as a bookkeeper/office manager. Over the course of the parties' marriage,

HPI compensated Laura for her services at an average of approximately $65,000 annually. On a number of occasions, Laura asked Harry, HPI's sole shareholder, to issue shares of HPI in her name, in addition to the salary that she received. Harry refused each time.

According to Harry, Laura did a "terrible job" at HPI. Indeed, after reviewing the books that Laura had managed, the company's accountant realized that they were full of discrepancies. For instance, Laura had documented a $100,000 check in the company books as "helicopter parts," but she had actually written the check to herself and had deposited it into her personal account. Laura had also written another check from HPI for $100,000 with the notation "transf to health savings," and had deposited the funds into a certificate of deposit in her name only. The company's accountant concluded that Laura had been embezzling from the company.

A forensic accountant later calculated that Laura had misappropriated $368,476.19 in cash from HPI between May 2010 and November 2011 alone. At trial, Laura conceded that she probably should not have used company funds as she had, including using HPI money to fund her "hobby" of collecting vintage Thunderbird automobiles valued at $325,000.

After the parties separated for the final time in 2011, Laura wrote a letter to HPI's customers advising them of the parties' upcoming divorce, describing the "terrible current situation," and claiming that "my children and our entire lives and future lives, is at stake now." Laura urged HPI customers to contact her directly and to "report anything to 911 that you feel is for the safety of my

children." In Harry's view, Laura's letter created an "embarrassing situation," and Harry noticed that "business dropped off" after she sent the letter to his customers. Harry obtained a restraining order preventing Laura from contacting any customers of HPI and ACS and restraining her from interfering with the operations of the businesses.

At trial, the court valued HPI and ACS at $3.3 million. Because each member of the marital community had been compensated for their services during the marriage, the trial court found the companies, which had been formed prior to marriage, to be Harry's separate property.

At the commencement of the marriage, Harry owned two other properties in addition to HPI, ACS, and the assets owned by those companies. He owned a residence at 8515 Semiahmoo Drive in Bellingham, which he had purchased in 1995 for $212,546. The property included a small house. When the parties met, Harry had already torn down that house and broken ground on the construction of a new home. By the time the parties married, Harry had spent a total of $588,760.51 on the property, excluding the value of his labor. Laura did not contribute any money to the house prior to marriage. The family lived in the Semiahmoo Drive home throughout the marriage. The trial court valued the Semiahmoo Drive home at $1.25 million.

Harry also owned a nearly 15-acre landlocked property near the airport, which he had purchased in 1998 for recreation purposes. The trial court valued this property at $206,000.

In 2005, Laura presented Harry with quitclaim deeds for these properties

and other real property acquired by HPI or ACS prior to marriage. Harry testified that Laura claimed that the deeds were necessary "in case something happen[ed] to [Harry], that there wouldn't be a problem with the will and insurance policies and with the court." The deeds purported to convey the properties to both parties, but made no mention of any intent to create community property. Harry, who had not consulted an attorney, testified that he did not intend to change the ownership of any of his properties, but only intended the deeds to be used for estate planning purposes.

Laura testified that the deeds were intended to "commingle" the parties' properties. The trial court found Laura's testimony "less credible" than Harry's. With the exception of the Semiahmoo Drive property, the trial court found all these premarital properties to be Harry's separate property. The trial court found that the Semiahmoo Drive property was part community and part separate property. Harry's $588,760.51 premarital contribution was separate property, and the remaining value was community property.

Laura owned 6.71 acres on Bay Road in Blaine, Washington, prior to marriage. Laura had signed a quitclaim deed purporting to convey this property to both parties. The trial court valued the Bay Road property at $157,500, and found it to be Laura's separate property.

Laura also owned a home on E Street in Blaine prior to marriage. Laura paid off the $37,787 mortgage and made improvements to the property during the marriage. Laura did not execute a quitclaim deed for this property. The trial court valued the E Street property at $177,000, and found that $139,213 was

Laura's separate property, and the remaining value was community property.

Finally, Laura also owned a rental home in Blaine when the parties married, which she sold for $89,000 in 2001. Laura also did not execute a quitclaim deed for this property. Laura retained the proceeds from the sale, and the trial court found the proceeds were Laura's separate property.

The only real property acquired during marriage were three parcels of nearly 32 acres, described as "H & L Land." The parties had initially considered developing the property for investment or their retirement. The trial court valued the H & L Land at $272,000 and found it to be community property, even though its mortgage was paid by HPI, Harry's separate property business.

The parties had a volatile relationship. In May 2009, the parties got into an argument over groceries, precipitated by an earlier argument over finances. Harry admitted that he threw into the garbage some groceries that Laura had purchased. Laura retaliated by emptying a garbage can onto the hood of Harry's Mercedes. Harry then broke a car window. He then retreated, realizing that the argument was getting out of control. As Harry tried to leave the house with the children to let matters cool down, Laura called 911 and told Harry that she would have him arrested. Laura then pounded her fists on the side of Harry's head in the driveway.

When the police arrived, there was blood running down the side of Harry's head. Laura was arrested for assault. Laura denied striking Harry, but subsequently pled guilty to a charge of disorderly conduct.

After this incident, Laura filed the first petition for dissolution. Even though

she was the one arrested for assault, Laura claimed that Harry was the aggressor during the marriage. She alleged, among other claims, that Harry had punched her in the stomach without warning while she was speaking to two people at the company. Harry denied Laura's allegations.

Despite the ongoing litigation and conflict, the parties worked toward reconciliation, ultimately dismissing the dissolution action in March 2011 after a nearly two-year separation. The reconciliation was short-lived.

The parties separated for the final time on November 11, 2011, when Laura was arrested a second time for assaulting Harry. That day, Harry had been watching television with the children when Laura accused Harry of "stabbing" a cake that she had recently baked. Harry denied the accusation, and Laura hit Harry on the temple—"not very hard but hard enough to get [his] attention." Harry and the parties' son went to the kitchen to look at the cake. It appeared to have "little cracks" that one would expect when a cake is taken out of the oven. After Harry tried to explain the cracks to Laura, she punched him in the eye.

Harry called 911. The police interviewed the parties for two hours. Once again, Laura denied striking Harry but both children reported to the police that they had witnessed Laura "poke" and "punch" their father. Harry told the police that he did not want Laura arrested as the children were home. However, the police told him that they had to take Laura to the police station.

Laura was again charged with assault. This time, Laura entered a mental health deferred prosecution to avoid trial. In her petition for deferred prosecution,

she claimed that the "wrongful conduct charged is the result of or caused by mental problems." Her petition also states that she understands "that the court will not accept a petition for deferred prosecution from a person who sincerely believes that he or she is innocent of the crime(s) charged or does not suffer from alcoholism, drug addiction, or mental health problems." Laura also "stipulate[d] to the admissibility and sufficiency of the facts in the attached police reports." As part of the deferred prosecution, Laura was ordered to undergo counseling while on probation for five years.

After the parties separated, Harry and the children remained at the family residence on Semiahmoo Drive. Laura moved into her separate property residence on E Street.

Harry filed a petition for dissolution on December 7, 2011. On February 2, 2012, a temporary parenting plan was entered placing the children primarily in Harry's care, with a midweek visit and alternating weekend visits with Laura. Harry was also ordered to pay Laura monthly temporary maintenance.

Both parties sought to have the children reside with them a majority of the time. On May 16, 2012, the trial court appointed David Nelson as guardian ad litem (GAL). As part of his investigation, the GAL contacted the parties' collateral witnesses and the professionals involved in the prior dissolution. At the end of his investigation, the GAL concluded that the children should reside a majority of the time with Harry, who the GAL believed provided the most stability for the children.

The GAL rejected Laura's claims that Harry was an alcoholic, mentally ill,

and not in control of his emotions. The GAL noted that Harry had already been evaluated for chemical dependency, with the conclusion that there was insufficient evidence of chemical dependency. The children also denied that their father abused alcohol. The GAL also reported that, based on his investigation and observations, he believed that Harry could control his emotions and create stability for the children.

The GAL expressed concern that Laura's anger toward Harry was damaging the children. Both children reported that their mother discussed the criminal and divorce cases with them. The children reported that their mother was "constantly discussing the case with them and blaming the [f]ather for both her criminal case, lack of visitation, the current temporary custody order, and her lack of money." The children also reported that they "sometimes feel like [their] [m]other is using them to punish [their] [f]ather."

The GAL expressed concern that Laura continued to view herself as a "victim" despite evidence that she was the aggressor in the parties' relationship. The GAL noted that by pursuing a deferred prosecution, Laura essentially admitted to assaulting Harry due to mental health problems. The GAL, as well as Laura's probation officer, both expressed concern that Laura's purported mental health counseling for her probation was only serving to "reinforce[] and enable[] [m]other to believ[ing] she is a victim."

After hearing Laura testify, the trial court agreed with the GAL's assessment, expressing concern with Laura's view of herself as a victim. The trial court rejected Laura's excuse that somehow Harry's actions "drove" or

"compelled" her to attack him. The trial court found that any alleged "verbal tirades" by Harry were eclipsed by Laura's physical assaults.

The GAL acknowledged that his view of the case was contrary to those held by most of the professionals involved in the parenting dispute during the 2009 dissolution action. However, most of those individuals had not been involved with the family for the immediately preceding two or three years, or had only spoken with Laura. The GAL observed a change in the family situation since the 2009 case. "I have seen stability . . . , which did not exist in any way with the first dissolution." The GAL concluded that this new stability was due to Harry learning from his prior experiences and making an effort to provide the children with a stable home life. The GAL believed that Laura had not learned anything and that she could not control her emotions, as she continued to involve the children in the divorce despite being subject to court oversight.

The trial court gave credence to the GAL's observations and conclusions, noting that the opinions of other professionals were "so remote in time" and "based on observations made a number of years ago." The trial court also agreed that the evidence strongly suggested that, if the children were to reside with her a majority of the time, Laura would "go to great lengths to restrict [Harry's] time with the children in what seemed to be reflective of a desire to maintain control and punish [Harry] by withholding contact with the children rather than being motivated by a legitimate concern for the children's best interests."

The parties' first trial date was scheduled for November 6, 2012. An order

- 10 -

compelling discovery was entered, requiring the parties to disclose their expert witnesses by Monday, October 8, 2012—30 days before trial. Laura had not yet disclosed any expert witnesses when, on October 22, 2012, she sought to continue the November 6 trial date.

The trial court granted Laura's request to continue the trial date. The court ordered the trial "continued to the earliest date after January 1, 2013 which the clerk can schedule this case for trial." The trial was continued to October 8, 2013 nearly a year after the original trial date. A new order compelling discovery was entered requiring disclosure of expert witnesses by September 9, 2013. The new cut off for any discovery, other than supplemental responses, was also September 9, 2013. Laura also failed to disclose her witnesses by the new deadline of September 9, 2013.

On Thursday, October 3, 2013 at 10:45 p.m.—two court days before trial was to start on Tuesday, October 8, 2013—Laura disclosed the names of 14 expert witnesses she intended to call at trial, and for the first time produced their reports to Harry. One of the reports was dated November 6, 2012; another was dated May 15, 2013; a third was dated September 14, 2013.

On the first day of trial, Harry moved to exclude these late-disclosed witnesses, with the exception of the GAL. Laura's counsel conceded error in failing to timely disclose the witnesses and reports, but asked the court to either deny Harry's motion or continue the trial date 30 days to allow Harry an opportunity to depose the expert witnesses. Laura also produced a "revised" disclosure, reducing the number of proposed expert witnesses from 14 to 8.

- 11 -

The trial court declined to continue the trial date and partially granted Harry's motion to exclude witnesses. The trial court "specifically" excluded Laura's financial experts, finding that allowing them to testify "would result in prejudice to the petitioner's case [that] would be very difficult to overcome." However, the trial court noted that it believed that some of the information from these experts' reports could still possibly be admitted in rebuttal or as the result of "skillful cross-examination."

The trial court also excluded the testimony of Jeff Lustick, Laura's attorney in the criminal matter, who Laura claimed would "explain" the order for her mental health deferred prosecution. The trial court questioned the need for Lustick's testimony, as the court documents should "speak for themselves."

The trial court allowed the remaining witnesses to testify—whether as direct, rebuttal, or fact witnesses. The only other witness in dispute was a "fact" witness, Robert Gillespie, who Laura claimed would testify to a purported domestic violence incident between Laura and Harry. Laura asked the court to allow Gillespie to testify by telephone or some other electronic means because he allegedly feared Harry and demanded an armed escort from Canada to the courthouse. The trial court denied her request, finding that Gillespie's alleged fear was not "at all reasonable," that a "deputy on call" could provide security for Gillespie in the courthouse, and that he could testify live in the courtroom.

In dispute at trial were property distribution, maintenance, and parenting. In a letter ruling issued on November 8, 2013, the trial court acknowledged that it was faced with "numerous . . . conflicting stories and explanations of events."

The trial court found that while Harry at times minimized facts that would reflect negatively upon him, overall Laura was "less credible" than Harry.

The trial court awarded each party their separate property. The trial court made a disproportionate award of the community property to Laura due to "the earning potential of [Harry] and the total amount of his separate property holdings and viewed in light of the factors to be considered in regard to division of property." The trial court awarded Laura $1.205 million of the parties' $1.643 million community estate, including a $250,000 cash payment and most of the cash accounts. In addition, Laura received over $385,000 in separate property. Harry received $437,735 of community property, including the family residence where he and the children reside, and separate property worth $4.160 million, including the business valued at $3.3 million. The trial court also awarded Laura an additional four years of maintenance.

The children reside a majority of the time with Harry under the parenting plan. While the trial court expressed concern with allegations that Harry had used inappropriate language in front of the children, it was more concerned with the fact that the mother had been charged with two crimes arising from physical assaults against the father. The trial court stated that it considered Laura's decision to accept a deferred prosecution as an acknowledgment that she in fact committed the acts that led to her arrest. The trial court also found that Laura was "equally capable of verbal abuse" that could emotionally harm the children. In addition to the criminal charges, the trial court found that "other information presented at trial" compelled the ruling that the children reside a majority of the

time with the father. The trial court found that it was strongly suggested by the evidence that, if the children resided a majority of time with the mother, she would go to "great lengths to restrict the [father's] time with the children . . . to maintain control and punish the [father] [and not due to any] legitimate concern for the children's best interests." The trial court stated that its decision was "made upon considering each and every statutory factor viewed in light of all the evidence and testimony, and is deemed to be that which is in the best interests of the children."

The trial court found that restrictions on the mother's decision-making ability were warranted, and ordered the father to have sole decision-making for major decisions for the children. The trial court found that the mother had a "history of acts of domestic violence" and engaged in the "abusive use of conflict . . . which creates the danger of serious damage to the children's psychological development."

The trial court ordered both parties to participate in a substance abuse evaluation and a "batterer's/anger management/controlling behavior" evaluation within 30 days. As dictated in the court's letter ruling, Harry completed the evaluations and submitted them to the court. Laura took exception to the evaluations completed by Harry and moved to stay or delay entry of the final orders until the parties agreed on the parameters of the evaluations.[1]

---

[1] This motion for stay is not in the record on appeal, or reflected on the superior court docket. However, it is mentioned in various parts of the record and in appellant's brief.

The trial court denied the motion, noting that it did not expect that the evaluations would change its decision on parenting. The trial court did not intend to have a "new trial" after the evaluations were completed, and the recommended evaluations were simply intended to be "assurances" due to the parties' conflicting allegations.

Final orders were entered on December 13, 2013. On December 23, 2013, Laura moved for reconsideration. The trial court denied reconsideration on February 21, 2014. The trial court stated that its decision "was both significant and difficult and that there were strengths and weaknesses in each parties' case, and the court ha[d] carefully considered those strengths and weaknesses and [had] based its original decision on such careful consideration and a weighing of all of the evidence and testimony."

Laura appeals.

## II

Laura first contends that "[t]he trial court erred by refusing to grant [her] a brief continuance . . . , resulting in exclusion of critical witnesses for [her]." Br. of Appellant at 3. Her argument is unavailing.

"Whether to grant or deny a continuance is a question 'addressed to the sound discretion of the court, and the exercise of that discretion will be set aside only for a manifest abuse thereof.'" Tucker v. Tucker, 14 Wn. App. 454, 455, 542 P.2d 789 (1975) (quoting MacKay v. MacKay, 55 Wn.2d 344, 348, 347 P.2d 1062 (1959)).

The trial court herein offered the following reasonable explanation of its decision not to grant Laura's requested continuance:

> I think a continuance is out of the question. This case was continued a year ago. We could say that we will grant a short continuance. Everybody could agree to a short continuance but because of getting bumped, there is a strong probability getting bumped by a criminal matter that could keep these people married for a year or more, and I think that's completely unreasonable under the circumstances when we have such a contentious group of issues before us now.[2] We have the parties and counsel ready for trial . . . we even had a previous dissolution that we filed and subsequently [dismissed]. So these parties need to, you know, need to get divorced. The marriage needs to be dissolved.

We find no abuse of discretion in the denial of the motion for continuance.[3]

### III

Laura next contends that the trial court abused its discretion "by signing the final orders."[4] Br. of Appellant at 4. This is so, she asserts, because, in so doing, the trial court disregarded "extensive and significant" contradictory evidence. Her contention is unavailing.

---

[2] The resolution of these issues, which included significant parenting issues, would affect not only the parties, but also their two children.

[3] Laura assigns error to the trial court's refusal to grant a continuance, not to its exclusion of some of her witnesses. Moreover, she does not analyze the requirements for excluding witnesses as a discovery sanction as established by Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997), and its progeny. Br. of Appellant at 28-29 (argument as to the above-quoted assignment of error). Therefore, we do not further address this potential issue. State v. Olson, 126 Wn.2d 315, 321, 893 P.2d 629 (1995) ("[W]hen an appellant fails to raise an issue in the assignments of error, in violation of RAP 10.3(a)(3), and fails to present any argument on the issue or provide any legal citation, an appellate court will not consider the merits of that issue."). However, given the lack of clarity that pervades Laura's appellate merits briefing, we note that the trial court herein engaged—on the record—in the analysis required by Burnet before excluding any of Laura's witnesses, and that the trial court's orders were reasonable.

[4] Laura also assigns error to the trial court denying her motion for reconsideration. Br. of Appellant at 4. We review these claims together.

A

Trial courts are given broad discretion to fashion a parenting plan based upon the children's best interests, after consideration of the statutory factors. In re Marriage of Jacobson, 90 Wn. App. 738, 743, 954 P.2d 297 (1998) (citing In re Marriage of Littlefield, 133 Wn.2d 39, 52, 940 P.2d 1362 (1997)). Discretion is abused only if the decision is manifestly unreasonable or based on untenable grounds. Jacobson, 90 Wn. App. at 743.

A trial court's findings of fact are verities on appeal where an appellant does not assign error to those findings. In re Marriage of Petrie, 105 Wn. App. 268, 275, 19 P.3d 443 (2001). Laura has not assigned error to any of the trial court's findings. Therefore, they are verities on appeal.

Here, the trial court found that the mother had a "history of acts of domestic violence" and engaged in the "abusive use of conflict . . . which creates the danger of serious damage to the children's psychological development." The trial court did not find any facts to support restrictions on Harry's parenting. Based on these facts, the trial court did not abuse its discretion by designating the children reside a majority of the time with their father and granting him sole decision-making authority.

Laura's contention to the contrary is simply that she believes that the evidence she presented was more "powerful" than the evidence presented by Harry, and that her evidence did not support the trial court's decision to have the children reside a majority of the time with their father. But factual disputes cannot be retried on appeal. Our "role or function is not to substitute our

judgment for that of the trial court or to weigh the evidence or credibility of witnesses." In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

The trial court properly crafted a parenting plan that was in the children's best interests. The trial court's evaluation of the evidence is not a basis for reversal.

B

The trial court also properly concluded that the various properties retained their character as separate property, except to the extent that the community contributed to improvement, regardless of the quitclaim deeds placing title in both parties' names.

A spouse's separate property includes, "[p]roperty and pecuniary rights owned by [the] spouse before marriage." RCW 26.16.010. "[T]he character of property as separate or community property is determined at the date of acquisition." In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). "Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." Borghi, 167 Wn.2d at 484.

There is no dispute that Harry owned the property awarded to him as his separate property before he married Laura. Laura contends, however, that clear and convincing evidence of a transfer of Harry's separate property to community property exists, based on the inclusion of her name on the quitclaim deeds

- 18 -

subsequent to the marriage. This contention is foreclosed by our Supreme Court's decision in In re Estate of Borghi, 167 Wn.2d 480.

In Borghi, the Supreme Court rejected an argument that a special warranty deed placing both spouses' names on title to real property owned by the wife prior to marriage created a presumption that the property had "transmuted" from separate to community property. The court held that there must be "clear and convincing evidence of actual intent" of the separate property owning spouse to create community property to rebut the presumption that separate property retains its character. Borghi, 167 Wn.2d at 490. The court held that merely including the name of the other spouse on a deed is not "evidence [of] an intent to transmute separate property into community property but merely an intent to put both spouses' names on the deed or title." Borghi, 167 Wn.2d at 489.

Here, nothing in the deeds purports to create community property. Instead, as in Borghi, the evidence supports simply an "intent to put both spouses' names on the deed or title." Harry testified that he did not intend to change ownership of the property by signing the quitclaim deeds, and that his only intent was to accommodate any issues that might arise were he to die. The trial court properly concluded that these properties remained each party's separate property regardless of the quitclaim deeds.

After properly characterizing the properties, the trial court did not abuse its discretion in awarding each party their separate property and awarding the wife more of the community property in light of the husband's greater separate property holdings.

The trial court has "broad discretion" in dividing property, "because it is in the best position to determine what is fair, just, and equitable." In re Marriage of Wallace, 111 Wn. App. 697, 707, 45 P.3d 1131 (2002). Here, the trial court considered the statutory factors in making a property division that it found equitable, noting that "reaching an *equitable* division rather than an *equal* division is the Court's goal." (Emphasis added.)

Laura leaves a relatively short-term marriage with 73 percent of the community property, all of her separate property, and a total of six years of maintenance. The trial court's property division was well within its discretion.

## IV

Laura's final claim of error, which she acknowledges is "clearly not . . . attributable to the trial court," is that she was denied a fair trial "as a result of the Inadequate Representation and failure of her trial attorney." Br. of Appellant at 4. Laura contends that, based on the alleged ineffective assistance of her trial counsel, she is entitled to a new trial where she can be properly represented. Her contention is unavailing.

There is no right to counsel in a dissolution proceeding.[5] See King v. King, 162 Wn.2d 378, 395, 174 P.3d 659 (2007). "When . . . counsel is not

---

[5] The cases Laura cites in claiming that she is entitled to a new trial because her representation by trial counsel "was grossly deficient, highly damaging in all respects to the mother and highly ineffective" are criminal cases, where there is a constitutional right to effective assistance of counsel. Br. of Appellant at 35-36, citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (death penalty) (1984); State v. Thomas, 109 Wn.2d 222, 225, 743 P.2d 816 (1987) (conviction for attempt to elude police); State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991) (conviction for first degree murder).

- 20 -

required, there is no right to effective assistance." <u>Nicholson v. Rushen</u>, 767 F.2d 1426, 1427 (9th Cir. 1985).

Laura was not entitled to counsel, effective or otherwise, in this action to dissolve her marriage. Her contention to the contrary fails.[6]

Affirmed.

We concur:

COURT OF APPEALS DIV.
STATE OF WASHINGTON

2015 APR 27 AH 9: 05

---

[6] Laura also assigns error to the trial court's "refus[al] to grant [her] motion for a stay of entry of final orders, to allow the court to review, consider and weigh critical additional evaluation evidence as to the parties DV/anger and A&D history, behavior and dynamics." Br. of Appellant at 3. Yet, she cites no authority in support of her implied assertion that this is a claim upon which relief can be granted. <u>West v. Thurston County</u>, 168 Wn. App. 162, 275 P.3d 1200 (2012) ("We do not consider conclusory arguments that do not cite authority."); <u>see also</u> RAP 10.3(a)(6), 10.4. We do not further address this issue.