**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Marriage of<br><br>JULIA ROKHSAR,<br><br>        Respondent,<br><br>  and<br><br>ROBERT ROKHSAR,<br><br>        Appellant. | No. 83509-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — This is a dissolution action between Robert Rokhsar and Julia Rokhsar. Robert appeals and argues that the trial court abused its discretion when it made several errors related to the property distribution and denied Robert's request for a downward deviation of child support.[1] We affirm.

I.

A.

Robert and Julia met in New York and began dating in 2005. When they met, Julia worked in marketing and media, while Robert worked at a hedge fund. They

---

[1] Consistent with the parties' briefing and to avoid confusion, we refer to the parties by their first names. We mean no disrespect.

married in May 2012 in Seattle, Washington. After they married, Robert decided to start his own hedge fund.

Julia stopped working in December 2014, one month prior to the birth of the parties' son. Julia then stayed home to care for the children. The parties moved to Seattle in April 2015. Their daughter was born in 2016.

Throughout the marriage, Robert controlled the parties' finances. Julia testified that she "never had access to any of our accounts . . . never saw statements" and she was "largely kept in the dark."

Robert formed Group 166 Capital LLC (Group 166 Capital) in August 2013. Robert is the sole owner of Group 166 Capital. Group 166 Capital manages two investment funds, Group 166 Investment Fund LP (Group 166 Investment) and Group 166 Opportunities, Ltd—an offshore investment fund.[2] Group 166 Capital is the general partner of Group 166 Investment and the investment manager of Group 166 Opportunities. Group 166 Investment had between 6 and 10 limited partners, all of whom were friends or family of Robert. Similarly, Group 166 Opportunities had 15 investors, all Robert's friends and family. Group 166 Investment's largest limited partner was Ted Schiffman, Robert's friend from college.

Robert structured Group 166 Capital to receive performance incentives when the two funds increased in value. Thus, if Group 166 Capital increased the value of the money in Group 166 Investment above a threshold amount of 6 percent, then each of

---

[2] As of December 2019, the Group 166 Opportunities account held 1.655 million. Group 166 Capital was entitled to a portion of the fund in exchange for its performance. Robert had personally invested in Group 166 Opportunities. In any event, the trial court did not assess whether Robert's investment was community or separate property or whether the Group 166 Opportunities account held any community property.

the individual investors would pay Group 166 Capital 25 percent of the appreciation. Thus, while Robert does not receive a traditional paycheck from his business, he is entitled to compensation for his management of the fund as well as distributions from the fund.

Robert waived the management fees Group 166 Capital was entitled to from the fund's appreciation for the years 2013, 2014, 2016, and 2017.

In 2015, Robert took a one-time management fee of $260,790, to help with the purchase of the family home in Seattle. And in summer 2018, Robert negotiated with the investors via side letters to reimburse him for the fees he had failed to take for several years. This amounted to $1,233,798 that Robert would receive in monthly installments between September 2018 and June 2020.

In 2019, Group 166 Investment's largest investor Ted Schiffman, decided to withdraw his capital from the fund. At the beginning of 2019, Schiffman had $9.9 million invested in the Group 166 Investment fund. In August 2019, about $5 million of Schiffman's capital was returned to Schiffman. About $3.7 million was refunded to Schiffman in September 2019. The remaining amount of Schiffman's funds included $395,538 of historical incentive fees that Robert had failed to take from Schiffman between 2013 and 2017, plus a $991,347 holdback. This holdback was based on the investor agreement between Group 166 Investment and Schiffman and the amount would be held until the accountants had a chance to review the books and verify the numbers.

B.

The marital community ended on November 25, 2019 when Julia filed for dissolution. Upon filing, an automatic temporary financial restraining order was put in place.

On the date of separation and entry of the financial restraining order, the Group 166 Capital account balance was $776,899. That same day, Robert took $20,000 out of the account to pay a retainer for an attorney. Then Robert transferred $391,879 out of the same account to Ted Schiffman.

Julia moved for a temporary family law order. Robert failed to present financial information to the court about the Group 166 entities. Under the temporary order, Robert was ordered to pay Julia $10,000 per month pending trial in undifferentiated support. Julia testified at trial that Robert stopped paying the full amount. Because of this, Julia took out loans to help pay her costs and attorney fees.

A bench trial occurred over several days starting in November 2021. Both parties testified and each presented a forensic accountant to testify about the community assets, including Group 166 Capital. The trial court entered written orders. The trial court divided the assets and debts and awarded Julia a marital lien of $97,791. Robert moved for reconsideration which the trial court denied.

Robert appeals.

II.

The trial court's distribution of property in a dissolution action is guided by statute, which requires it to consider multiple factors in reaching an equitable conclusion. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007).

-4-

These factors include: (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the division of property is to become effective. RCW 26.09.080. In weighing these factors, the court "may properly consider a spouse's waste or concealment of assets." In re Marriage of Wallace, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002) (citing In re Marriage of White, 105 Wn. App. 545, 551, 20 P.3d 481 (2001)).

A fair and equitable distribution "does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." In re Marriage of Zahm, 138 Wn.2d 213, 218-19, 978 P.2d 498 (1999).

A trial court has considerable discretion in making a property division and will not be reversed on appeal absent a showing of manifest abuse of discretion. In re Marriage of Kraft, 119 Wn.2d 438, 450, 832 P.2d 871 (1992). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

A.

Robert first argues that the trial court erred by mischaracterizing two of his retirement accounts as community property. We disagree.

In a dissolution action, all property, both community and separate, is before the trial court for distribution. Friedlander v. Friedlander, 80 Wn.2d 293, 305, 494 P.2d 208 (1972). A trial court is not bound to award property to the individual or the community based on the property's classification but "the court must have in mind the correct

character and status of the property as community or separate before any theory of division is ordered." Blood v. Blood, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966).

Robert first argues that the trial court made a scrivener's type mistake related to his main retirement account, "IB Rollover IRA x2003," by mislabeling the allocation to Julia as community property. During its oral ruling, the trial court determined that this account was Robert's separate property except for a $5,000 deposit made to the account on January 3, 2013, during the marriage. Because of that deposit, the court found that $13,961.35 were community funds.

Robert's proposed asset division allocated money from this account to Julia. While reviewing Robert's proposed asset division, the court pointed this out and said, "So this would give a considerable portion of [Robert's] IRA to [Julia], even though we already know that only $13,961 of it was community initially." Robert's counsel explained, "this was just an effort to give [Robert] some cash as he goes forward . . . it has to come out of the home proceeds . . . it has to come out of the IRA." After further discussion on the proposed distribution, Robert's counsel explained that "after thinking about it over the break, [Robert] decided that he would prefer to have less cash and more from his IRA." The trial court adopted Robert's proposed asset division and thus did not err.

Robert next argues the trial court erred in concluding that the Roth retirement account in his name, "IB Roth x7157," was community property. Property acquired during marriage is presumed to be community property, unless this presumption is rebutted by clear and convincing evidence. In re Marriage of Janovich, 30 Wn. App. 169, 171, 632 P.2d 889 (1981). When there is any uncertainty in tracing an asset to a

separate property source, the law resolves the uncertainty in favor of a finding of community character.  See Connell v. Francisco, 127 Wn.2d 339, 351, 898 P.2d 831 (1995).

Julia presented evidence that the account had been opened during the marriage and thus was presumed to be community property.  In contrast, Robert argued that while the account was opened during the marriage, the funds came from Robert's separate property.  But Robert did not present any admissible account records for "IB Roth x7157" or the account, Fidelity 6910, establishing where the funds came from.

The trial court characterized the account as community property based on the presumption that property acquired during marriage is community property and the burden of rebutting that presumption is on the party challenging its status.  The court's ruling explained its conclusion:

> [W]hat I see are deposits during the marriage.  What I don't see are records reflecting that that money just is some separate property account . . . So I'm presuming that those funds given the deposit dates are community property and that [Robert] has not met his burden of establishing that they're not.

Here, the trial court, after hearing the testimony of both parties and reviewing the admissible evidence, determined that Robert had not rebutted the presumption that this account was community property.  Because we will not substitute our judgment for that of the trial judge in resolving factual disputes, we find that the trial court did not err.  In re Marriage of Greene, 97 Wn. App. 708, 715, 986 P.2d 144 (1999).

B.

Robert argues that the trial court abused its discretion under White, by distributing community property to him that no longer existed at the time of trial.  At

issue was the trial court's allocation of $776,899 in community assets from Group 166 Capital's general partner account to Robert. We disagree.

Robert's reliance on White is misplaced. In White, the wife used $30,511 of her separate property to pay off community obligations, including a mortgage and car loan, during the marriage. 105 Wn. App. at 547. During the dissolution trial, the trial court awarded the $30,511 to the wife as her separate property. White, 105 Wn. App. at 552. On appeal, this court held that the $30,511 lost its character as separate property when it was used to pay off community debts and therefore could not be distributed as separate property. White, 105 Wn. App. at 552. But the court did not hold that the $30,511 could not be considered in determining an equitable division of property. Rather, the court emphasized that the trial court had discretion to divide the property to ensure that the wife recovered her "unusually significant contribution to the value of the home and car" from the community property. White, 105 Wn. App. at 551-52.

White does not support Robert's premise that one spouse may appropriate community assets to his own use without consequence. Washington law is to the contrary: "Washington courts recognize that consideration of each party's responsibility for creating or dissipating marital assets is relevant to the just and equitable distribution of property." In re Marriage of Williams, 84 Wn. App. 263, 270, 927 P.2d 679 (1996). The question, therefore, is whether the court correctly found that Robert dissipated more than $776,899 in community assets and did not use the funds for community purposes.

The evidence shows that as of the date of separation, November 25, 2019, the Group 166 Capital balance, containing management fees earned by the community,

was $776,899.  Robert testified that the business and this account were community assets.  Robert also held an investment in Group 166 Investments as a restricted limited partner.  As of the date of separation, that account held $168,432.  The trial court ruled that both were community assets based, in part, on Robert's testimony.

On November 25, 2019, Robert transferred $20,000 from the capital account for his attorney fees.  Then, on December 1, 2019, Robert transferred $391,879 of fees earned by the community to Ted Schiffman.  These withdrawals occurred after a temporary financial restraining order was put in place.  The trial court found that "community funds that were transferred to Mr. Schiffman, will have to be accounted for, and it will be [Robert] that will account for them."  In December 2019, Robert made a $20,000 withdrawal and then a $50,000 withdrawal from the account.  Julia did not receive funds from either withdrawal.  The trial court found that Robert was accountable for that amount to the community.

The trial court recognized that Robert likely used some money from this account on the community before trial.  "I do find the evidence credible and the argument persuasive that [Robert] was making these withdrawals in part to satisfy his obligations under the temporary order."  However, "whatever else he was doing with his money, whether it was legal fees or living expenses or anything else . . . [h]e was spending down a community asset."

While Robert argued that the performance of the fund dwindled when COVID-19 lockdowns began, he did not provide evidence or tracing of exactly what happened with the rest of the money in either account.  The trial court emphasized much of the challenge it laid "at the feet of [Robert] because there is this whole pot of money that

[Robert] didn't address." The trial court stated, "nobody's done that analysis as to how those investments were affected by COVID, segregating that money from what was taken out over time." The trial court explained, "I'm starting with that $756,899. And you can say all you want that it was unjust, but you had an opportunity to put up evidence to the contrary and you didn't." Still, in recognition that some funds likely went to support Julia, the trial court designated $106,385 as a "predistribution" to Julia.

On reconsideration, the trial court also explained, "[Robert] took a community asset—management fees—and spent it, in Schiffman's case, by giving hundreds of thousands of dollars in community funds back to Schiffman for Schiffman to invest in the fund." At trial, the court agreed with Robert that the Group 166 Investment fund was the investor's property. Thus, Robert "took community funds from the GP [Capital] account and put them beyond the community's reach in the investment fund." The trial court also explained that Robert "otherwise failed to account for the rest" of the missing community funds.

As Robert appears to concede in his opening brief, "if a spouse wrongfully spends down or transfers property before trial, the White rule does not block an unequal distribution of existing property to remedy that injustice." And the trial court has discretion to assign value to property within the scope of evidence in the case. In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982). The trial court dealt with Robert's spending down of community assets accordingly. These assets were included on the portion of the asset distribution list, drafted by Robert, where the trial court dealt with prior predistributions and additional support owed. The trial court did not distribute assets that no longer existed as Robert contends.

Thus, the trial court did not abuse its discretion in its determinations about the Group 166 funds.

C.

Robert next argues that the trial court abused its discretion because the property distribution left the parties with a patent disparity in their economic conditions; the trial court failed to make adequate findings; and the findings were not supported by substantial evidence. We disagree.

As discussed above, the trial court must dispose of all property and liabilities of the parties, either community or separate, as is just and equitable under RCW 26.09.080. The trial court need not make formal findings on the factors, so long as it is evident from the record that it actually considered all of the relevant factors. In re Marriage of Steadman, 63 Wn. App. 523, 526, 821 P.2d 59 (1991). A trial court's factual findings are accepted if they are supported by substantial evidence. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). An appellate court should "not substitute [its] judgment for the trial court's, weigh the evidence, or adjudicate witness credibility." Greene, 97 Wn. App. at 714.

Here, in its written findings and conclusions, the trial court found: "[T]he court considered that [Robert] did not disclose funds available to the parties at the temporary hearing in December 2019 which was $756,899.00 and that [Robert] then transferred $391,879.00 of community funds into a third party's account in violation of the automatic financial restraining order which was in place." The trial court concluded, "[t]he division of community personal property described in the final order is fair (just and equitable).

-11-

The Court finds that in this case just and equitable requires a 50/50 split." Exhibit A was attached and made part of the findings.

> In its oral ruling, the trial court explained:
>
> The Court's paramount concern—I said this the other day—is the economic condition in which the dissolution is going to leave the parties. And in this case, it will leave [Robert] owing [Julia] almost about $100,000 . . . So this division will leave [Julia] with a good deal of cash to move on with her life. And it will leave [Robert] in the negative column, although not owing I think as much as the petitioner would have proposed, and I conclude that, under the circumstances in this case, that is a just and equitable division of the property.

The record reflects that the trial court was considering all of the relevant factors throughout its consideration of the marital assets and debts. And the trial court went through the parties' proposed asset distributions, item by item, determining the character of the asset. The trial court then reviewed revised proposed asset distributions from each party.

The trial court adopted Robert's proposed asset distribution, leading to a $97,791 marital lien in favor of Julia. As discussed above, the trial court appropriately considered Robert's dissipation of community assets after the financial restraints were put in place. And substantial evidence supports the trial court's findings on that issue. Further:

> It was the duty of appellant to make a full and fair disclosure of all property, both separate and community, as he had its management and control. The court was not satisfied that he had done so. In such a situation appellant must not be surprised if the courts take that fact into consideration in making an equitable distribution of property.

Rentel v. Rentel, 39 Wn.2d 729, 736, 238 P.2d 389 (1951).

While Robert argues that the property distribution was unjust and inequitable, the trial court reviewed extensive records about the parties' assets and debts, heard testimony from the parties and their witnesses, and fashioned a distribution that it believed was fair under the circumstances. Both the trial court's written findings and the oral record reflect the court's consideration of the factors under RCW 26.09.080. The trial court did not abuse its discretion.

III.

Robert argues the trial court abused its discretion by failing to grant a downward deviation of his child support obligation to zero. He contends the trial court erred because the children spend nearly 50 percent of their time with Robert and he is liable for almost 50 percent of the children's medical, education, and agreed extra-curricular expenses. We disagree.

We review a trial court's decision on child support for abuse of discretion, recognizing that such decisions are seldom disturbed on appeal. In re Marriage of Booth, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). A trial court abuses its discretion if its decision rests on unreasonable or untenable grounds. In re Marriage of Schnurman, 178 Wn. App. 634, 638, 316 P.3d 514 (2013).

The child support statute is intended "to insure that child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. When setting child support, the trial court begins by setting the basic child support obligation based on the statute's economic table. RCW 26.19.011(1), .020. The economic table is presumptive for combined monthly net incomes up to and

including $12,000. RCW 26.19.065(3). "When combined monthly net income exceeds twelve thousand dollars, the court may exceed the presumptive amount of support set for combined monthly net incomes of twelve thousand dollars upon written findings of fact." RCW 26.19.065(3). Under RCW 26.19.075(1)(d), the trial court may deviate from the standard calculation if the children spend a significant amount of time with the parent who is obligated to make a support transfer payment. But the trial court "may not deviate on that basis if the deviation will result in insufficient funds in the household receiving the support to meet the basic needs of the child." RCW 26.19.075(1)(d).

The trial court found that the parents' combined net income exceeded $12,000 per month. It imputed Julia's net monthly income to be $3,321.00 and Robert's net monthly income to be $9,677.21, for a combined monthly net income of $12,998.21. The trial court also found that the standard calculation would require a total child support obligation of $2,380.00 per month, consistent with RCW 26.19.020, of which Julia's share would be $606.90 and Robert's share would be $1,773.10. The trial court chose not to deviate from the standard calculation because there was not a good reason to approve the deviation requested by Robert.

The trial court did not award Julia maintenance or attorney fees. Julia testified that she had not worked since 2014 to stay home and care for the parties' children. But, since the parties separated, Julia has been looking for work. Julia explained the challenges she has faced in seeking employment:

> [F]irst of all, working full time would be difficult with my schedule—with my children's schedule; but also, the fields that I worked in . . . are really not around anymore. I worked in print magazines, and I worked on brands, placing print advertisement and marketing. Also, the magazine industry is much smaller in Seattle than it is in New York.

By trial, Julia had applied for over 50 freelance jobs and 24 full-time jobs. Because of the difficulty she was facing, she began working towards obtaining her insurance broker license. The position would be commission based and in her first year Julia may only earn $20,000. The trial court found Julia's testimony about this credible. Julia argued at trial that deviating downward would result in financial hardship to her household.

In contrast, while Robert's income was also imputed, he had a historical rate of pay of approximately $14,000 per month. Robert had recently obtained his MBA. Robert's accountant testified that if Robert were to go work for one of the big wirehouses managing funds, he could earn between $200,000 and $300,000.

The trial court agreed with Julia that a downward deviation was not warranted and denied Robert's request. We conclude that the trial court did not abuse its discretion in denying Robert's request.

We affirm.

Mann, J.

WE CONCUR:

Díaz, J.

Mixon, J.