[No. 27282-2-II. Division Two. May 10, 2002.]

*In the Matter of the Marriage of* TINA M. WALLACE, *Respondent,* and D. RANDY WALLACE, *Appellant.*

698

*Dennis G. Ott*; and *Catherine Wright Smith* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*), for appellant.

*Tina M. Wallace*, pro se.

*Kenneth W. Masters* (of *Wiggins Law Offices, P.L.L.C.*), for respondent.

BRIDGEWATER, J. — D. Randy Wallace appeals from a dissolution decree, alleging bias and errors in the valuation of certain property. We affirm.

Randy and Tina Wallace married in November 1980 and had three children. The parties separated in May 1998. In August 1999, Tina petitioned for dissolution in Cowlitz County.

Randy had interests in the following (rock crushing and road building) businesses:

* Wallace Sand and Gravel (WSG)—a sole proprietorship that Randy started in 1992.
* Wallace Sand and Gravel, Inc. (WSGI)—a separate corporation that Randy owned.
* Wallace Brothers, Inc. (WBI)—a corporation started by Randy's father and uncle. When the parties separated Randy owned 55 percent of WBI.

Between 1992 and the parties' separation, WSG was the family's primary source of income. During this time, Randy also received wages from WBI.

Randy operated WSG, mining gravel on 200 acres of property on Mandy Road (the Mandy Road property) where the family also lived. In 1986, Randy purchased this property from his father, agreeing to pay $3,500 per month. Randy, however, could not produce evidence of having made a single payment. (His father did not ask for payment until six months after the parties separated.) In November 1998,

Randy, without Tina's permission, quitclaimed the Mandy Road property back to his father "in lieu of foreclosure." Report of Proceedings (Jan. 17, 2001) at 85.

After quitclaiming the Mandy Road property, Randy entered into a written agreement wherein he rented the property. This "Rental and Stumpage Agreement" required Randy to pay his father approximately $27,000 per month for use of the Mandy Road property, certain equipment, and for any rock and topsoil he removed. In a separate document, Randy agreed to rent an $80,000 piece of equipment for $10,000 per month. Randy admitted that Tina did not know about these agreements.

Randy transferred other assets to relatives without Tina's knowledge or consent. For example, Randy gave some of WSG's equipment and 45 percent of WSGI to the parties' children. He sold the other 55 percent of WSGI to his father for $95,000.

After Randy disposed of WSGI, a superior court judge entered a temporary order restraining the parties from disposing of community assets, except in the normal course of business. A month later, Randy, without the court's or Tina's approval, wrote his father two $100,000 checks. Soon thereafter, Randy paid his father another $80,000.

After learning of Randy's actions, Tina filed a contempt motion. In May 2000, the court granted her motion and ordered Randy to pay $10,000 in attorney fees and costs.

At trial, Randy admitted to hiding the full extent of his property when Tina's lawyer asked about the real property that he owned. He failed to disclose the "Stuckey" property he owned through WSGI and the "Lewis County wetlands" he owned with his father and uncle. The evidence also supported that Randy dissipated WSG's assets. After 1998, WSG paid substantial amounts for material and equipment to Randy's father under the stumpage agreement, which lowered net income.

When Randy's father sued the parties in Lewis County to recover money owed under the stumpage agreement, Randy

did not defend the claim. A Lewis County court held that the deed to Randy's father, which led to the stumpage agreement, violated community property law because the Mandy Road property belonged to the community and Tina did not consent to the transfer. Consequently, neither Tina nor the community were liable for the debt. Randy, however, admitted that he owed the money so the court entered a judgment against him for $207,000.

One month before trial, WBI distributed most of its cash—$260,000—to Randy's father and uncle. Randy, WBI's majority shareholder, denied any responsibility for such payments; he did, however, authorize the transfer of funds into the account from which his uncle and father withdrew them.

Randy submitted an estimate showing that the future cost of reclaiming the Mandy Road property, after the pit is exhausted, would exceed $685,000. A Department of Natural Resources reclamation specialist estimated the cost at only $120,000.

Ultimately, the trial court ruled as follows:

a. [Randy] has failed to provide complete financial records which has been done deliberately. [Randy's] failure to provide complete financial information was deliberate and fraudulent and that he either fraudulently or grossly negligently wasted community assets.

b. The transfer of [the] Mandy Road [property] to [Randy's] father . . . was fraudulent. It was done with the intent to deprive [Tina] of the community interest in the property.

c. The "Rental and Stumpage Agreement" that was executed between [Randy] and his father after the [parties] separat[ed] was unreasonable and burdensome and there was no reasonable justification for that lease at all.

d. [Randy's] decrease in business and shutting down of the business known as Wallace Sand and Gravel was a deliberate attempt to make himself look poor for the purposes of the dissolution of marriage action. [Randy] has wasted that community asset and said waste was done deliberately.

e. [Randy's] consent to a judgment in a Lewis County lawsuit for the Rental and Stumpage Agreement was fraudulent and a waste.

f. [Randy's] transfer of cash to his father for debts and other claimed debts owed to his father was fraudulent. Any alleged debt owing on the Mandy Road property was barred by the statute of limitations and the court finds that there were no such debts.

g. The sale of the ["Stuckey"] property owned by Wallace Sand and Gravel, Inc., was fraudulent and done for the purpose of depriving [Tina] of her community interest in said property.

h. The conveyance of stock in Wallace Sand and Gravel, Inc., by [Randy] to his father was not for a bonafide consideration to the community and was fraudulent.

i. [Randy's] claimed reclamation costs on the Mandy Road pit are grossly and fraudulently over-inflated.

j. [Randy] abandoned any responsibility for Wallace Brothers, Inc., wherein he was the majority shareholder. The court finds that there was no excuse for [Randy] abandoning his responsibility to this corporation when he is the majority shareholder.

k. The disbursement of $260,000 to [Randy's] father and uncle . . . is compelling evidence that [Randy's] father and uncle have raided the corporation for the purpose of lowering [Randy's] value.

l. The account receivable in Wallace Brothers, Inc., which has been carried on the books as an asset of $430,000 has some value. [Randy's] representation that the account receivable has no value is fraudulent. The corporate shareholders have included the account receivable in financial statements when they wanted the corporation to look good and are now saying that it has no value when they want the corporation to look bad.

Clerk's Papers at 15-16.

Property Distribution

The trial court found that the Mandy Road property was worth $800,000 based on its assessed value but valued it at zero and awarded it to Tina. Likewise, the court awarded

the "Stuckey" property, purchased through WSGI for $175,000, at zero and awarded it to Tina.

The court awarded Randy the interest in WBI as community property. The court also ordered him to pay the Lewis County judgment of more than $207,000, an "equalizing" judgment of $240,000 to Tina, and $10,000 in attorney fees.

## I. Whether the trial court violated the appearance of fairness doctrine

Randy argues that the trial court violated the appearance of fairness doctrine. He relies on the following exchange with the trial court:

THE COURT: I'm going to interrupt for a minute. I want to ask you a question about the Mandy Road property.

[Randy]: Okay.

THE COURT: Do I understand that you've given that back to your father?

[Randy]: Yes.

THE COURT: Okay. Now, I want you to think about this when you come back.

[Randy]: All right.

THE COURT: If it's really your position that your father owns that and you don't own it anymore—

[Randy]: Yes.

THE COURT:— then I'm going to give it all to her.

[Randy]: Yeah.

THE COURT: Okay. And then [Tina's attorney will] bring an action to set aside the transfer to your father as a fraudulent conveyance.

[Randy]: Yeah.

THE COURT: She's going to end up with it all and you're going to end up with nothing. I'm going to give it to her as a zero balance on the balance sheet because you're telling me it has a zero value.

When you come back from lunch, I want you to tell me whether you think it has a zero value for her. You understand that?

[Randy]: Well, not totally.

THE COURT: You'd better talk to your lawyer about it.

[Randy]: Okay.

[Randy's attorney]: I don't think he's saying it has a zero value.

THE COURT: If she doesn't own it, if the father owns it, I'm going to give it all to her at zero value, if that's his position.

[Randy's attorney]: Okay, I understand your position.

Report of Proceedings (Jan. 18, 2001) at 96-97. Tina answers that Randy waived the appearance of fairness issue and, alternatively, that the trial court did not show bias; both of her arguments are well taken.

A. *Waiver*

■ Tina correctly points out that Randy failed to raise the appearance of fairness issue below. Under RAP 2.5(a), an "appellate court may refuse to review any claim of error which was not raised in the trial court." Furthermore, Washington courts have applied the doctrine of waiver to bias and appearance of fairness claims.[1]

■ In his reply brief, Randy argues, without authority, that moving to disqualify the trial judge was unnecessary to preserve the appearance of fairness issue. "Contentions unsupported by argument or citation of authority will not be considered on appeal." *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986) (citing RAP 10.3(a)(5)), *review denied*, 107 Wn.2d 1020, *cert. denied*, 482 U.S. 916 (1987).

---

[1] *State v. Bolton*, 23 Wn. App. 708, 714, 598 P.2d 734 (1979) (this court refused to consider appearance of fairness issue raised for first time on appeal), *review denied*, 93 Wn.2d 1014 (1980); *In re Welfare of Carpenter*, 21 Wn. App. 814, 820, 587 P.2d 588 (1978) ("a litigant who proceeds to trial knowing of potential bias by the trial court waives his objection and cannot challenge the court's qualifications on appeal"); *Brauhn v. Brauhn*, 10 Wn. App. 592, 597, 518 P.2d 1089 (1974) ("One who claims a judge trying claimant's case is biased may waive his right to complain thereof by not timely raising the objection and proceeding with trial or continuing with a pending trial as if the judge were not disqualified.").

### B. *Bias*

▮▮▮ "To prevail under the appearance of fairness doctrine, the claimant must provide some evidence of the judge's . . . actual or potential bias[,]" *State v. Dugan*, 96 Wn. App. 346, 354, 979 P.2d 885 (1999); prejudice is not presumed, *State v. Dominguez*, 81 Wn. App. 325, 328-30, 914 P.2d 141 (1996). After a claimant presents sufficient evidence of potential bias, we consider whether the appearance of fairness doctrine was violated. *Dominguez*, 81 Wn. App. at 329-30. "The test is whether a reasonably prudent and disinterested observer would conclude [that the claimant] obtained a fair, impartial, and neutral trial." *Dominguez*, 81 Wn. App. at 330. In addition, we consider allegedly improper or biased comments in context. *See Wells v. Whatcom County Water Dist. No. 10*, 105 Wn. App. 143, 158, 19 P.3d 453 (2001); *In re Dependency of O.J.*, 88 Wn. App. 690, 697, 947 P.2d 252 (1997), *review denied*, 135 Wn.2d 1002 (1998).

▮▮ Randy argues the trial court showed bias when it informed him that it would value the Mandy Road property at zero and award it to Tina if he claimed that his father owned the property. Tina persuasively argues that the trial court did not show bias but merely informed Randy of the legal consequences of his position.

At trial, Randy testified that, without Tina's consent, he quitclaimed the Mandy Road property to his father. But he could not do this. Under RCW 26.16.030(3), "Neither spouse shall . . . convey . . . community real property without the other spouse joining in the execution of the . . . instrument by which the real estate is . . . conveyed[.]"[2] Furthermore, when read in context, it is clear that the trial court's comments did not show bias, but instead explained the inevitable legal consequences of Randy's position.

In addition, Randy's trial counsel stated that he understood the court's position. Moreover, Randy could have changed his own position.

---

[2] *See also Sander v. Wells*, 71 Wn.2d 25, 28, 426 P.2d 481 (1967) ("Contracts which convey . . . community realty and which lack [a spouse's] signature are *voidable* . . . ."); *Pixton v. Silva*, 13 Wn. App. 205, 208, 534 P.2d 135 (1975) (the sale of community real property by one spouse without joinder of the other is voidable).

## II. Did the trial court err in valuing two parcels of real property at "zero" and awarding them to Tina?

Randy argues that the trial court erred by assigning the Mandy Road and Stuckey properties a zero value and awarding them to Tina as a penalty for his conduct.[3] In its oral ruling, the trial court stated that it used Randy's figures to value the properties. Randy claims that he never testified that the properties were worthless, only that they were not available for distribution in the divorce action.

Randy further claims that any penalty for his conduct should have been addressed via an award of fees or the costs of recovering any improperly transferred property. Finally, Randy argues that there is no authority for awarding property to an innocent spouse at zero value to penalize the other spouse for failing to provide information or conveying property out of the marital community. Tina answers that the trial court did not abuse its discretion when it considered Randy's conduct in dividing the property.

■■ The trial court has broad discretion to distribute property during a dissolution proceeding because it is in the best position to determine what is fair, just, and equitable. *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). A party challenging a property distribution must demonstrate that the trial court manifestly abused its discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or for untenable reasons. *In re Marriage of Thomas*, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991).

■ In a dissolution proceeding, "the court shall, without regard to *marital misconduct*, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable." RCW 26.09.080 (emphasis added). Randy mistakenly argues that

---

[3] For purposes of this argument, Randy concedes that the trial court could find that he acted fraudulently.

this directive bars a trial court from considering all types of misconduct in making its property distribution. RCW 26.09.080, however, "refers to immoral or physically abusive conduct within the marital relationship and does not encompass gross fiscal improvidence [or] the squandering of marital assets." *In re Marriage of Steadman*, 63 Wn. App. 523, 528, 821 P.2d 59 (1991) (footnote omitted).

 In making its property distribution, the trial court may properly consider a spouse's waste or concealment of assets.[4] Here, the record is replete with evidence that Randy committed waste and attempted to conceal assets.

 For example, Randy quitclaimed the Mandy Road property to his father "in lieu of foreclosure," despite that the debt was uncollectable due to the six-year statute of limitations on written contracts. RCW 4.16.040. Furthermore, Randy's father did not demand payment on the 1986 promissory note until after Randy and Tina separated. And under the stumpage agreement, Randy rented an $80,000 piece of equipment from his father for $10,000 per month. In fact, Randy's actions so troubled the trial judge that he began his oral ruling by stating: "Well, this is a disturbing case, probably the most disturbing case I have heard in domestic relations[.]" Report of Proceedings (Jan. 18, 2001) at 199.

Furthermore, other jurisdictions have upheld a trial court's finding that an asset has zero value where the record supported it.[5] Here, the record supports such valuations.

---

[4] *In re Marriage of White*, 105 Wn. App. 545, 551, 20 P.3d 481 (2001) ("When exercising its discretion, a trial court is permitted to consider . . . a spouse's unusually significant contributions to (or wasting of) the assets on hand at trial."); *In re Marriage of Nicholson*, 17 Wn. App. 110, 117, 561 P.2d 1116 (1977) ("The trial court did not abuse its discretion . . . when it is considered that the husband's concealment of assets may be taken into account in determining the property division.").

[5] *See Wagner v. Wagner*, 16 Va. App. 529, 431 S.E.2d 77, 79 (1993) (evidence supported trial court's finding that wife's interest in shopping mall had zero value, where her father testified that refinancing, which caused mall to lose value, was legitimate business strategy, not deliberate effort to devalue wife's interest); *Willis v. Willis*, 19 Ohio App. 3d 45, 482 N.E.2d 1274, 1277 (1984) (evidence supported trial court's finding that stock in boarding stable owned by husband, wife, and

The Mandy Road property was assessed at more than $800,000; Randy's expert witness testified that its market value was only $600,000. Tina's expert set the property's future reclamation costs at $120,000; Randy estimated $685,000. In addition, the trial court noted that Tina might incur litigation expenses to set aside the conveyance from Randy to his father. The record contains fewer details on the Stuckey property, although WSGI originally purchased it for $175,000. Based on Randy's figures, and not just on the unavailability of the property, the trial court could have given the properties a zero value.[6]

There was no error in the trial court's valuations or the award to Tina.

### III. Did the trial court's dissolution decree disestablish a third party's property interests?

■ Randy next argues that the trial court erred by purporting to disestablish his father's property rights to the Mandy Road property. *See In re Marriage of Soriano*, 44 Wn. App. 420, 422, 722 P.2d 132 (1986) ("The dissolution court has no power over the property as to the rights of third parties claiming an interest in the property."). Here, Randy refers to one of the trial court's findings: "[Randy]'s transfer of cash to his father for debts and other claimed debts owed to his father was fraudulent. Any alleged debt owing on the Mandy Road property was barred by the statute of limitations and the court finds that there were no such debts." Clerk's Papers at 15.

Despite Randy's conception of this finding, the trial court did not determine the rights of any nonparty, including his father. In his oral ruling, the trial court expressly stated

---

their son and daughter-in-law had zero value, where stable sustained "severe losses," parties did not expect payment on notes owned by son and daughter-in-law, and principal balance on stable's mortgage was due the year after property distribution); *see also In re Marriage of Mullins*, 121 Ill. App. 3d 86, 458 N.E.2d 1360, 1364 (1984) (trial court properly assessed that husband's life insurance policies had zero value, where he borrowed against the policies to the full extent of their value).

[6] The trial court did, however, find that Randy's reclamation figures were fraudulent.

that he lacked the authority to set aside Randy's convey-ance of the Mandy Road property to his father.

IV. Is Tina entitled to her attorney fees on appeal?

Finally, Tina seeks attorney fees based on her need and/or Randy's intransigence. We find both.

Under RCW 26.09.140, "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." As an independent ground we may award attorney fees and costs based on intransigence of a party, demonstrated by litigious behavior, bringing excessive motions, or discovery abuses. *Gamache v. Gamache*, 66 Wn.2d 822, 829-30, 409 P.2d 859 (1965); *Eide v. Eide*, 1 Wn. App. 440, 445-46, 462 P.2d 562 (1969). If intransigence is established, we need not consider the parties' resources. *In re Marriage of Crosetto*, 82 Wn. App. 545, 564, 918 P.2d 954 (1996). Randy has demonstrated his intransigence at trial. To appeal the result justifies an attorney fees award to Tina on appeal. *In re Marriage of Mattson*, 95 Wn. App. 592, 606, 976 P.2d 157 (1999) ("[A] party's intransigence in the trial court can also support an award of attorney fees on appeal.").

We award Tina attorney fees in addition to statutory costs based both on her need and Randy's intransigence; the commissioner of this court is to set the amount upon appropriate application, considering both bases of the award.

Affirmed.

MORGAN and SEINFELD, JJ., concur.