# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Welfare of:<br><br>JB, Jr., 11/12/12. | No. 47903-6-II<br>(Consolidated)<br><br>PART PUBLISHED OPINION |
| In the Matter of the Guardianship of:<br><br>JB, Jr.<br><br>D.O.B.   11/12/2012 | No. 47918-4-II |

BJORGEN, C.J. — Appellant, JB, Sr., appeals the juvenile court's orders terminating the parental rights of JB, Sr. and KB as to JB, Jr. and denying the parents' petition to establish a guardianship for JB, Jr. with his grandparents AB and SB as guardians.

JB, Sr. argues that (1) the juvenile court erroneously considered the child's best interest under RCW 13.34.190(1)(b) before making the prerequisite determination on parental unfitness under RCW 13.34.180; (2) substantial evidence does not support the juvenile court's findings of fact related to RCW 13.34.180(1)(f); (3) substantial evidence does not support the juvenile court's findings that termination is in the child's best interest; (4) the juvenile court erred by not making a specific finding that a guardianship generally was not in the child's best interest; (5) the juvenile court erred by not considering JB, Jr.'s Indian heritage; (6) the juvenile court violated the separation of powers doctrine by accessing the Judicial Information System; and (7) the juvenile court violated the appearance of fairness doctrine.

In the published portion of this opinion, we hold that in a hybrid termination and guardianship proceeding, where the only contested issues are whether "continuation of the parent

and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home," RCW 13.34.180(1)(f), and whether a guardianship or termination is in the child's best interest, the juvenile court does not err by considering the proposed guardianship placement or the child's potential adoptive home in determining whether termination factor (f), regarding "early integration," has been established. Even though these considerations implicitly touch on the child's best interest, examination of that evidence is proper at this stage.

In the unpublished portion of this opinion, we hold that the juvenile court did not err in its findings of fact and conclusions of law and that it did not violate the separation of powers or appearance of fairness doctrines. We decline to consider whether the juvenile court erred in failing to consider JB, Jr.'s Indian heritage generally, because this issue was not sufficiently raised to the trial court. RAP 2.5(a).

Accordingly, we affirm.

FACTS

On November 12, 2012, JB, Jr. was born to JB, Sr., his father, and KB, his mother. On September 25, 2013, the Department of Social and Health Services (DSHS) filed a petition for the dependency of JB, Jr. after KB was arrested for shoplifting and the parents were found to be using methamphetamine and heroin. On November 13, the juvenile court entered an order of dependency, removed JB, Jr. from the parents' home, and placed him with KB's relative. In June 2014, KB's relative could no longer take care of JB, Jr., and he was placed in foster care, where he remains.

DSHS subsequently filed for termination of parental rights, alleging that all required services had been offered to the parents, that the parents made little or no attempt to correct their parental deficiencies through the services, and that the parents made little or no attempt to visit

2

their child regularly, among other matters. In response, the parents petitioned the court to establish a guardianship for JB, Jr. with the grandparents, AB and SB, as guardians. DSHS opposed the guardianship. The guardianship and termination matters were consolidated for trial.[1]

Upon the conclusion of trial, the juvenile court simultaneously entered a termination order and a guardianship order with findings of fact and conclusions of law. The orders first established that the parents stipulated to five of the required elements to either establish termination or a guardianship. *Compare* RCW 13.34.180(1)(a)-(e) *with* RCW 13.36.040(2)(c)(i)-(v). In its termination order, the juvenile court determined that the termination element of RCW 13.34.180(1)(f)—that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home—was met. It further found that the termination, not the proposed guardianship, was in JB, Jr.'s best interest. In pertinent part, the termination order reads:

### [Finding of Fact] IV

There is little likelihood that conditions will be remedied so that the above-named child can be returned to the parents in the near future. [KB] is currently unfit to parent the child. . . . She has acknowledged that she is not able to care for her child due to her own issues and wants the child to be placed in a guardianship.

[JB, Sr.] is currently unfit to parent the child. . . . He has acknowledged that he is not able to care for his child due to his own issues and wants the child to be placed in a guardianship.

### [Finding of Fact] VII

Continuance of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The Department can prove this element in one of two ways. *In re Welfare of R.H*, 176 Wn. App.

---

[1] In the unpublished portion of our opinion, we analyze the evidence and proceedings of this trial in greater detail.

3

419, 428, 309 P.3d 620 (2013). First, the Department can prove that prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement. Second, the Department can prove the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. A guardianship is material under *R.H.* as to whether the Department has established this element. The parents have filed a guardianship petition . . . naming [AB] and [SB] as proposed guardians, and the court has reviewed RCW 13.36 and the case law on this statute.

. . . .

Children already being in the [grandparents'] home is not the standard. Removing children from a home versus establishing a guardianship is not the same thing. No parent or custodian is perfect, but the home must be safe and stable for children. The court does find that the [parents and grandparents] are family and that they love [JB, Jr.]. Family is important. But, the court is not convinced that the[y] have the skills necessary to care for the child or that they have a home that is appropriate for the child.

. . . .

The child, [JB, Jr.] is a toddler and has been in foster care placements with maternal relatives and then his current placement the majority of his life. He has been in his current placement for a year, and it is safe, stable and appropriate. This placement is meeting his needs and is a potential adoptive home. The Department has proven that prospects for a permanent home exist but that the parent-child relationship prevents the child from obtaining that placement. The only option for a permanent, safe and stable home for the child is by an adoption. That home will not be able to adopt [JB, Jr.] if the parents retain their parental rights.

[Finding of Fact] VIII

An order terminating all parental rights is in the best interests of the minor child. [JB, Jr.] needs a permanent and stable home and his current placement is safe, stable and appropriate. [KB] and [JB, Sr.] have not been able to care for this child and indicated that they wanted [AB and SB] to care for the child. The needs of the child are being met by the current home for the child, and not by the parents.

. . . .

[Conclusion of Law] II

That it would be in the best interest of the minor child, including the child's health and safety, that the parent-child relationship between the above-named child and [KB] mother, and [JB, Sr.], father, be terminated and that the child be placed in the custody of the [DSHS] for placement as best suits the needs of the child.

. . . .

4

[Conclusion of Law] IV

That an order terminating the parent and child relationship between [KB], mother. [JB, Sr.], father and [JB, Jr.], child, is in the best interests of the child. An order establishing a guardianship under RCW 13.36 is not in the best interests of the child.

Clerk's Papers (CP) at 97-99. The juvenile court's guardianship order substantially mirrored the above findings and conclusions.

JB, Sr. appeals.

ANALYSIS

JB, Sr. argues that the juvenile court erroneously considered the child's best interest under RCW 13.34.190(1)(b) before making the prerequisite determination on parental unfitness under RCW 13.34.180. We disagree.

Under RCW 13.34.180, a party seeking termination of a parent-child relationship must establish the following:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
. . . .
(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

In addition, a court must also find that termination "is in the best interests of the child." RCW 13.34.190(1)(b).

In support of his argument, JB, Sr. cites *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232

P.3d 1104 (2010), where the court described the two-step process a juvenile court must take

before terminating parental rights:

> By virtue of RCW 13.34.180(1) and RCW 13.34.190, a Washington court uses a two-step process when deciding whether to terminate the right of a parent to relate to his or her natural child. The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence. The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence. Only if the first step is satisfied may the court reach the second.

(Footnotes omitted.) In *AB*, the father argued that the juvenile court violated this two-step

process by examining AB's best interests at the same time it was determining whether the father

was unfit. The *AB* court agreed because the juvenile court's findings demonstrated that it

concurrently considered the child's best interest and parental unfitness, stating:

> In the course of deciding whether to terminate Salas' parental rights, the trial court in this case reasoned in part that A.B. had been living with T.L. all of her life; that A.B. was fully integrated into T.L.'s home and had not developed a significant relationship with Salas; and "that it is in [A.B.'s] best interest to maintain a relationship with her father and his family provided that the continuation of that relationship does not constitute a perpetual challenge to the legitimacy of the placement with [T.L.]." In making these and other similar statements, the trial court was obviously focusing on A.B.'s best interests, as opposed to Salas' current unfitness. Accordingly, we are required to hold that the trial court reasoned erroneously.

*Id.* at 926 (alterations in original) (footnotes omitted).

Unlike *AB*, the procedural posture in the present case involved the juvenile court making

simultaneous determinations about whether termination or a guardianship was more appropriate

for JB, Jr. In addition, the parents stipulated to five of the required elements to establish either a

termination or guardianship. *Compare* RCW 13.34.180(1)(a)-(e) *with* RCW 13.36.040(2)(c)(i)-

(v). The only remaining elements for the juvenile court to determine were whether termination

element (f) was met, RCW 13.34.180(1)(f), and whether termination or a guardianship was in the best interest of JB, Jr. RCW 13.34.190(1)(b); RCW 13.36.040(2)(a).

Termination element (f) implicitly touches on the best interest of the child standard. To establish element (f), DSHS must show "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). It can prove this in two ways. First,

> [t]he State can prove prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement. Alternatively, the State can prove the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement.

*In re Welfare of R.H.*, 176 Wn. App. 419, 428, 309 P.3d 620 (2013) (citations omitted). Both ways of proving element (f) contemplate the availability of a permanent and stable home for the child. To that extent, termination element (f) measures parental unfitness by examining whether the parental relationship impedes the child's welfare by diminishing its chances of entering into an enduring home. This directly involves consideration of the child's best interests.

Further, if a party petitions the juvenile court to place a child with guardians, the court should weigh the potential guardianship in calculating whether termination element (f) has been established. As we noted in *R.H.*, 176 Wn. App. at 428-29,

> The availability of a guardianship placement is material to determining whether the State can prove either of these means of satisfying RCW 13.34.180(1)(f).
>  . . . .
> [T]he availability of a guardianship is evidence that the trial court should consider when determining whether the State has met its burden to prove RCW 13.34.180(1)(f).

A juvenile court can only order a guardianship if it is in the child's best interests. RCW 13.36.040(2)(a). In making this determination, the juvenile court considers

*the strength and nature of the parent and child bond*, the benefit of continued contact with the parent or the extended family, the need for continued State involvement and services, *and the likelihood that the child may be adopted if parental rights are terminated.*

*In re Welfare of A.W.*, 182 Wn.2d 689, 711-12, 344 P.3d 1186 (2015) (emphasis added).

Thus, when the juvenile court considers whether termination element (f) has been established, *R.H.* allows it to consider the proposed potential guardianship. *R.H.*, 176 Wn. App. at 428-29. In turn, that guardianship can only be established by determining whether it is in the child's best interest, which requires consideration of the parent-child bond and the potential adoptive home. *Id.*; *A.W.*, 182 Wn.2d at 711-12. Coming full circle, when a juvenile court determines whether element (f) is established, it necessarily considers to some degree what is in the child's best interest. *Cf. In re Dependency of K.D.S.*, 176 Wn.2d 644, 656, 294 P.3d 695 (2013).

Under these principles, when the juvenile court in the present case was determining whether termination element (f) was met, it was permitted to consider the prospects of JB, Jr.'s current foster home placement and the grandparents' suitability as guardians. In addition, the implicit consideration of the best interests of JB, Jr. in the juvenile court's determination whether DSHS established termination element (f) does not run afoul of the two-step process outlined in *A.B.* In *A.B.*, 168 Wn.2d at 926-27, the juvenile court's findings explicitly considered the child's best interest when determining parental unfitness under RCW 13.34.180. In contrast to *A.B.*, the juvenile court here recognized that the parents were unfit first. In finding four, it noted that both parents are "unfit" and "not able to care for [their] child," but wanted JB, Jr. to be placed with the grandparents as guardians. CP at 97. In finding seven, the juvenile court ruled that termination element (f) had been met because the grandparents were unsuitable as guardians and

that the parents would interfere with the prospect of the stable adoptive home—both proper considerations under *R.H.*. With the hybrid nature of this termination and guardianship proceeding, we cannot say that the court's findings erroneously focused on JB, Jr.'s interest, given the inherent overlap between termination element (f) and what will be in the child's best interest. Accordingly, JB, Sr.'s claim fails, and we affirm the juvenile court.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

I. EVIDENCE RELATED TO TERMINATION AND GUARDIANSHIP

At the bench trial, numerous witnesses testified, including the parents, grandparents, and an amalgam of DSHS employees. Their testimony established the facts detailed below.

1.    Parents' Fitness

Pursuant to a dependency dispositional order, the parents were ordered, among other things, to participate in urinary analyses, drug and alcohol assessments, and parenting classes. Both parents made little to no progress with the court-ordered requirements. Although the parents were permitted visitation during the dependency, they very sporadically visited JB, Jr. When they did visit him, they appeared to be under the influence of drugs or very tired. At the time of the termination hearing, the parents had active warrants for their arrest.

2.    Proposed Guardianship

The grandparents had prior criminal histories and had been involved with DSHS. They failed to submit required personal statements to DSHS explaining what they had done to ensure these issues did not reoccur. The grandparents also allowed the parents to live in their residence

while doing drugs. In 2014 a conflict between the grandparents arose, resulting in issuance of a domestic violence no contact order against AB, protecting SB. On a surprise visit to do a walk-through of the grandparents' home, witnesses testified that the home smelled of animal urine and feces, some of the rooms had exposed wires, and the floor was covered with clutter and soiled diapers. An unidentified person was observed sleeping in one of the bedrooms. The bedroom of MV—SB's child, who is a youth registered sex offender living with the grandparents—was observed without a functioning or properly set up alarm. MV's sex offender status required the grandparents to have this alarm properly set up and functioning.

3.      Potential Adoptive Parents

At the time of trial, JB, Jr. had been living with his foster parents for a year. The foster parents completed the home study process, background checks, and training in order to adopt JB, Jr. Furthermore, they were taking care of JB, Jr.'s special needs. No issues or concerns were reported after a DSHS visit to the foster parents' home.

## II. JUDICIAL INFORMATION SYSTEM

Midway through trial, the juvenile court stated that it might need to access the Judicial Information System (JIS) regarding the grandparents to ascertain whether placing JB, Jr. with them was appropriate. The JIS "is the primary information system for courts in Washington," providing an individual's criminal history information and involvement in other proceedings. https://www.courts.wa.gov/jis/. The juvenile court recognized that while RCW 2.28.210[2] was not in effect at the time of trial, it believed the statute "codifie[d] what is generally the law anyway." Report of Proceedings (RP) at 425, 431. Thus, the juvenile court stated it would look

---

[2] RCW 2.28.210 allows a court to access the JIS before granting relief in a number of proceedings including for termination and guardianship.

at the JIS information unless any party objected. The parties and juvenile court all agreed that

the court could consider the JIS information so long as the parties were given an opportunity to

provide contextual or rebuttal evidence. The JIS information on the grandparents was admitted

as exhibits 36 and 37.

### III.  JUVENILE COURT'S QUESTIONING OF THE GRANDPARENTS

After the parties had finished their examinations of the grandparents, the juvenile court

took the opportunity to question both individuals.

First, the court brought out AB's earlier testimony that while he knew MV was a sexually

aggressive youth, he did not know the details. It questioned how that could be when MV was

living in his home. The juvenile court also inquired about AB's involvement with a third-party

custody action, referring to his early testimony that a child had been "placed" with AB. RP at

359. However, the juvenile court's questions revealed that his characterization of that as a

placement was inappropriate when the third-party custody action had been unopposed. The

juvenile court then inquired about the character of the domestic violence no contact order entered

against him. Even though AB alleged there was no domestic violence between him and SB, the

juvenile court brought out that this type of no contact order requires a finding of domestic

violence before being issued.

As to SB, the court questioned her about the domestic violence no contact order. The

following exchange occurred:

> THE COURT: You said that you filled out paper work . . . after speaking
> with the court facilitator, and that she told you to put something down?
> Did she tell you to lie?
> SB: She didn't tell me to particularly lie, but she said I had to say something
> or it wouldn't have been granted.
> THE COURT: And the statement that you made for that petition was under
> oath, correct?

SB: I was never under oath. . .

THE COURT: The statement on the form that you filled out said, "this is under penalty of perjury," correct?

SB: Yes.

THE COURT: So you were under oath, correct?

SB: Yes, correct.

THE COURT: And the statement you made under oath was a lie; is that correct?

SB: Correct.

RP at 473.

The juvenile court then asked SB why she did not submit certain documents to DSHS:

THE COURT: And so your statement has been that you didn't submit [a personal statement] because [DSHS] told you it was a waste of time, but you continued to submit other materials.

So can you explain to me why you would find it worth your time to submit a number of other materials, but not that particular material?

SB: Because they knew my history, so I didn't feel that I technically had to sit down and write out a book as to what happened in my history . . .

THE COURT: Okay.

So the reason you didn't do it wasn't because [DSHS] told you it was a waste of time, but because you didn't want to take the time to do it?"

SB: No. I would have taken the time gladly.

RP at 475-76.

The juvenile court also questioned SB about her beliefs regarding MV's safety risks:

THE COURT: So you do or do not believe that [MV]'s a risk to your daughters?

SB: I don't believe that there is a safety risk to my daughters, no.

THE COURT: Well, isn't sexual touching a safety risk?

SB: I don't leave him unattended with my children.

THE COURT: Okay. But you . . . did not have functioning monitors on [MV]'s room, correct?

SB: The battery was working that night before.

. . . .

THE COURT: So it's your testimony that just coincidentally, before they arrived there, the battery had simply just died?

SB: Yes, because it was working the night before when I had turned it on.

RP at 478-79.

12

Then, referring to SB's earlier testimony that she would not allow DSHS into her home

on a visit in May without a witness, she and the juvenile court had the following exchange:

> THE COURT: Do you own a cell phone?
> SB: Yes, I do.
> THE COURT: And you took a selfie with that cell phone, correct?
> SB: Yes I did.
> THE COURT: So it has a functioning camera on it?
> SB: Yes.
> THE COURT: Does it have a video camera on it?
> SB: Yes.
> THE COURT: Did you have that back in May?
> SB: Not that phone. . .
> THE COURT: Okay.
> Did you have a phone back in May that had a functioning camera or video camera on it?
> SB: Yes.
> THE COURT: Okay.
> And it's your testimony that you would not allow the Department into your home in May without a witness, correct?
> SB: Correct.
> THE COURT: And why didn't you simply just use your phone to record the visit?
> SB: Because I didn't know at that time if I was allowed to or not.

RP at 479-80.

#### IV. WRITTEN AND ORAL RULINGS

Upon the conclusion of trial, as discussed in the published portion of our opinion, the

juvenile court simultaneously entered a termination order and a guardianship order with findings

of fact and conclusions of law. These orders established: (1) that all six elements required for

termination had been established by clear, cogent, and convincing evidence, including that

continuation of the parent and child relationship clearly diminishes JB, Jr.'s prospects for early

integration into a stable and permanent home, RCW 13.34.180(1)(f); and (2) that termination,

rather than a guardianship, was in the best interest of JB, Jr.. RCW 13.36.040(2)(a); RCW

13.34.190(1)(b).

13

In its written orders and oral ruling, the juvenile court discussed the grandparents' lack of credibility in detail, generally finding that

> [AB] and [SB] were not credible and their lack of credibility was stun[n]ing to the court. They refused to state the truth and did not take responsibility for anything. Instead, they minimized, denied, and avoided the truth.

CP at 96; RP (June 19, 2015) at 13. The juvenile court cited numerous examples that caused it to find the grandparents not credible, relying in part on its own questioning. In its oral ruling, the juvenile court talked about "pinn[ing]" SB down:

> So ultimately, when I *pinned* [SB] down on this and asked her to be -- to explain to me that discrepancy between why bother turning anything in, it's only going to be a waste of time, while at the same time repeatedly turning things in -- I think the claim was 14 or 15 efforts to turn in a background check -- when she explained, ultimately when *pinned* down, she says, "Well, it would have been just too long. It would have been a book." I think are the words. I have quotes on that.

RP (June 19, 2015) at 25 (emphasis added). The juvenile court also recognized that the grandparents loved JB, Jr.

## ADDITIONAL ANALYSIS

### I. TERMINATION/GUARDIANSHIP

JB, Sr. argues that (1) substantial evidence does not support the juvenile court's finding that termination element (f) was met; (2) substantial evidence does not support the juvenile court's finding that termination, rather than guardianship, is in the child's best interest; (3) the juvenile court erred by not making a finding that guardianship generally was not in the child's best interest; and (4) the juvenile court erred by not considering JB, Jr.'s Indian heritage. For the reasons stated below, we hold that these claims fail.

1.      Standard of Review

We review whether substantial evidence supports the juvenile court's findings of fact and whether those findings support the conclusions of law. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243-44, 237 P.3d 944 (2010); *In re Dependency of D.L.B.*, 188 Wn. App. 905, 914, 355 P.3d 345 (2015), *aff'd*, 186 Wn.2d 103 (2016). Substantial evidence is evidence that would persuade a fair-minded rational person of the truth of the declared premise. *D.L.B.*, 188 Wn. App. at 914. We do not reweigh the trial court evidence and defer to the juvenile court on issues of witness credibility and persuasiveness of the evidence. *Id.*; *In re A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Unchallenged findings are verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243. We review conclusions of law that are mistakenly characterized as findings of fact de novo. *Id.*

2.      Legal Principles

A juvenile court may enter an order terminating all parental rights to a child if it finds the six statutory elements in RCW 13.34.180(1) have been established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i); *K.D.S.*, 176 Wn.2d at 652. Clear, cogent, and convincing evidence exists when the ultimate fact at issue is "highly probable." *K.D.S.*, 176 Wn.2d at 653.

Only termination element (f) is at issue, which required DSHS to establish

[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f). As relevant, DSHS can prove element (f) by showing that "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement." *R.H.*, 176 Wn. App. at 428. "The availability of a guardianship placement is

15

material to determining whether the State can prove . . . RCW 13.34.180(1)(f)." *Id.* Along with

the elements in RCW 13.34.180, DSHS must also establish by a preponderance of the evidence

that termination is in the child's best interest. RCW 13.34.190(1)(b); *In re Welfare of M.R.H.*,

145 Wn. App. 10, 24, 188 P.3d 510 (2008).

Similar to termination, guardianships require many of the same elements to be

established, *compare* RCW 13.36.040(2)(c)(i)-(v) *with* RCW 13.34.180(1)(a)-(e), including that

a guardianship is in the child's best interest—the only guardianship element disputed in this

appeal. RCW 13.36.040(2)(a). Thus, when a termination and guardianship petition are being

pursued simultaneously, the juvenile court determines whether a preponderance of the evidence

establishes termination or guardianship to be in the child's best interest.

In determining the child's best interest, the juvenile court must "decide each case on its

own facts and circumstances." *A.W.*, 182 Wn.2d at 711. Some factors a juvenile court can

consider are the qualifications of the proposed guardians, the strength and nature of the parent

and child bond, the benefit of continued contact with the parent or the extended family, the need

for continued DSHS involvement and services, and the likelihood that the child may be adopted

if parental rights are terminated. *Id.* at 711-12; *In re Dependency of A.C.*, 123 Wn. App. 244,

254-55, 98 P.3d 89 (2004). "Where the parent's interests conflict with the child's rights to basic

nurturing, physical health, and safety, the rights of the child prevail." *A.W.*, 182 Wn.2d at 712.

3.    Termination Element (f)

JB, Sr. assigns error to the juvenile court's finding seven and conclusion three in the

termination order, arguing that substantial evidence does not support termination element (f),

which in turn, undermines its conclusion that DSHS established RCW 13.34.180(1)(f) by clear,

cogent, and convincing evidence. We disagree that the juvenile court erred in these rulings.

16

Here, substantial evidence supports termination element (f), that "continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). The parents failed to comply with the dependency requirements ordered by the court. They visited JB, Jr. rarely, and when they did, appeared under the influence of drugs. At the time of trial, they had active warrants for their arrest.

In addition, substantial evidence demonstrates that the guardianship would not lead to a stable and permanent home. The record shows that the grandparents permitted the parents to live at their residence while doing drugs. The grandparents failed to submit the required personal statements to DSHS. There was also evidence of prior disputes between the grandparents, one of which led to issuance of a domestic violence no-contact order. The record established in addition that the grandparents' home was unsanitary and unsafe for children.

DSHS also provided evidence that JB, Jr. has potential adoptive parents, but adoption was prevented by the existence of the parents' parental rights. JB, Jr. was in his foster home for a year, and his foster parents had completed the home study process and had shown they were able to take care of his specific needs.

For these reasons, substantial evidence supports the juvenile court's finding seven, which in turn, supports conclusion three, that termination element (f) was proven by clear, cogent, and convincing evidence.

4. Best Interest of the Child

JB, Sr. assigns error to the juvenile's court's finding that termination of parental rights, rather than a guardianship, was in JB, Jr.'s best interest. Because substantial evidence supports this finding, it was not erroneous.

17

As already examined above, the parents were determined to be unfit to parent JB, Jr. by

way of their stipulation to the first five elements of termination and the substantial evidence

supporting termination element (f). Further, the record established that the proposed guardians,

the grandparents (1) allowed the parents to be around JB, Jr. while actively using drugs; (2)

failed to submit personal statements explaining their criminal history and Child Protective

Services involvement; (3) had a potential domestic dispute; and (4) maintained an unsanitary and

potentially unsafe home for children. JB, Sr. points to several pieces of evidence that weigh in

favor of establishing a guardianship, rather than termination; primarily that JB, Jr. has a strong

bond with his parents and grandparents. The juvenile court, though, recognized that the parents

and grandparents "are family and that they love [JB] Jr." CP at 96. This demonstrates that the

juvenile court weighed the competing evidence and factors, including the family's bond with JB,

Jr., yet still determined that termination was in the child's best interest. We do not reexamine the

juvenile court's weighing of competing evidence. *A.V.D.*, 62 Wn. App. at 568.

Substantial evidence supports the juvenile court's finding that termination of parental

rights, rather than the proposed guardianship, was in JB, Jr.'s best interest. Accordingly, the

juvenile court did not err in this ruling.

5.      Finding Whether Guardianship Generally Was Not in the Child's Best Interest

JB, Sr. next argues that the juvenile court erred because it did not make a finding that a

guardianship generally was not in the best interests of JB, Jr. and only made a finding as to the

suitability of particular guardians, the grandparents. We disagree that this was an error and hold

that the juvenile court was not required to make this generalized finding.

A juvenile court cannot enter an order of a guardianship unless specific guardians have

been proposed. Along with the juvenile court finding that a guardianship is in the child's best

18

interest, it must also determine either "the *proposed* guardian is qualified, appropriate, and capable of performing the duties of guardian under RCW 13.36.050" or "[t]he *proposed* guardian has signed a statement acknowledging the guardian's rights and responsibilities toward the child." RCW 13.36.040(2)(b), (c)(vi) (emphasis added). Thus, the statute contemplates a finding whether the specific, proposed guardianship would be in JB, Jr.'s best interest.[3]

JB, Sr. argues that *A.W.*, 182 Wn.2d at 712-13 supports his contention that a generalized guardianship finding is required. In *A.W.*, the court examined whether the juvenile court was required to enter a finding that the specifically identified guardians were in the child's best interest. *See Id.* It answered in the negative, holding that the juvenile court's finding that a guardianship generally was in the child's best interest was sufficient to satisfy RCW 13.36.040(2). *Id.* at 713.

Contrary to JB, Sr.'s position, the *A.W.* court did not further imply that a juvenile court's finding as to specific guardians would be insufficient. Since the elements in RCW 13.36.040 require the juvenile court to ultimately make findings about the specific proposed guardians, it would be illogical to expand *A.W.*'s holding to *require* a generalized guardianship finding. Thus, just as a finding of general guardianship is sufficient to satisfy RCW 13.36.040, we hold a guardianship finding tailored to specific guardians satisfies RCW 13.36.040.

For these reasons, JB, Sr.'s claim fails.

---

[3] Further, we have previously stressed the importance of an *identified* guardian in determining whether to grant a continuance before proceeding to a trial on termination. *R.H.*, 176 Wn. App. at 423-24; *In re Welfare of N.M.*, 184 Wn. App. 665, 672, 346 P.3d 762 (2014).

6.       Indian Heritage

JB, Sr. contends that even though JB, Jr. does not qualify under the Indian Child Welfare

Act (ICWA), or the state equivalent, chapter 13.38 RCW, the juvenile court erred by not

considering his Indian heritage through AB. We decline to address the merits of this argument

because it was not raised to the juvenile court.

With exceptions not relevant to this appeal, we may refuse to review any claim of error

which was not raised in the juvenile court. RAP 2.5(a). The purpose of this rule is to afford the

juvenile court an opportunity to correct errors, which avoids unnecessary appeals and retrials. *In

re Structured Settlement Payment Rights of Rapid Settlements, Ltd.*, 166 Wn. App. 683, 695, 271

P.3d 925 (2012). Generally, an argument neither pleaded nor argued to the juvenile court cannot

be raised for the first time on appeal. *Wash. Fed. Sav. v. Klein*, 177 Wn. App. 22, 29, 311 P.3d

53 (2013), *review denied*, 179 Wn.2d 1019 (2014).

The ICWA applies to the placement and custody of Indian children, who must be either

(a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and the

biological child of a member of an Indian tribe. 25 U.S.C. § 1903(4); RCW 13.38.040(7). JB,

Sr. concedes that JB, Jr. does not qualify as an Indian child under these acts.[4] Nonetheless, JB,

Sr. contends that the juvenile court erred by not considering JB's Indian heritage generally. On

review of the record, however, JB, Sr. did not ask the juvenile court to consider his Indian

heritage generally in making its determinations. Nothing in JB, Sr.'s briefing, opening

statement, or closing argument to the juvenile court indicate that it should have considered this

---

[4] JB, Sr.'s petition for guardianship stated that JB, Jr. is not an Indian child and that "federal and
Washington State Indian Child Welfare Acts do not apply to these proceedings." CP at 341.

fact. Accordingly, because this issue was not raised before the juvenile court, we decline to reach its merits.

## II. JIS – SEPARATION OF POWERS

The JIS "is the primary information system for courts in Washington," providing a person's criminal history and involvement in other court proceedings. https://www.courts.wa.gov/jis/. At the time of this trial, the juvenile court did not have explicit authority to use the JIS in termination or guardianship proceedings. However, a bill had passed enacting RCW 2.28.210, which allows a juvenile court to access the JIS during termination and guardianship proceedings.

Because RCW 2.28.210 was not in effect at the time of trial, JB, Sr. argues that the juvenile court exceeded its authority and violated the separation of powers doctrine by accessing the JIS and retrieving information about the grandparents. We disagree and hold that the juvenile court did not violate the separation of powers doctrine.

Separation of powers is a constitutional doctrine that defines the separation between the three branches of our state's government, judicial, executive and legislative, granting each branch specific and limited powers. *State v. Rice*, 174 Wn.2d 884, 900, 279 P.3d 849 (2012); *State v. Moreno*, 147 Wn.2d 500, 505, 58 P.3d 265 (2002).

JB, Sr. contends that when the juvenile court looked at the JIS on its own initiative it was either entering into the territory of the executive branch's investigative power or the legislature's law making authority. We disagree on both points.

First, the juvenile court was not legislating by modifying RCW 2.28.210. Instead, it mentioned that in the future the bill would grant it explicit authority to rely on the JIS, but stated

it was not in effect yet. Recognizing this, the juvenile court provided the JIS information to all parties and asked for their consent to reading it. This does not constitute improper legislating.

Second, the juvenile court did not conduct an investigation reserved to the executive branch. Courts are allowed to take judicial notice of certain facts. Generally courts may only take judicial notice of a case presently before it or "in proceedings engrafted, ancillary, or supplementary to it." *Swak v. Dep't of Labor & Indus.*, 40 Wn.2d 51, 53, 240 P.2d 560 (1952). However, under ER 201(b) a court may take judicial notice of certain adjudicative facts:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

The legislature established the JIS as an "automated, centralized, statewide information system that serves the state courts," and a committee regulates its functions. GR 31(c)(7); *see also chapter* 2.68 RCW; https://www.courts.wa.gov/jis/. Even though RCW 2.28.210 was not in effect, JB, Sr. cites to nothing that would indicate that the juvenile court was restricted from utilizing the JIS. In fact, at the time of trial, the legislature had allowed juvenile courts to access the JIS in actions for child custody by nonparents. RCW 26.10.135(1); *see also In re Welfare of R.S.G.*, 172 Wn. App. 230, 248, 289 P.3d 708 (2012). Thus, no evidence suggests that the JIS's accuracy could reasonably be questioned.

The JIS allowed the juvenile court to ascertain the criminal histories and other proceedings involving the grandparents, which were generally not disputed throughout the trial. The juvenile court also gave the parties an opportunity to object or explain the information contained in the JIS, which implicitly served as "be[ing] heard as to the propriety of taking judicial notice and the tenor of the matter noticed." ER 201(e). Thus, this information was

22

capable of accurate and ready determination. Because the JIS and the information contained within satisfied ER 201(b), the juvenile court did not conduct an improper executive investigation.

Accordingly, because the juvenile court was neither impinging into the legislative or executive branch, no separation of powers violation occurred.

### III. APPEARANCE OF FAIRNESS

Finally, JB, Sr. contends that the juvenile court violated the appearance of fairness doctrine on three bases: (1) its initiative into looking at the JIS; (2) its "scathing" cross examinations of the grandparents; and (3) its unnecessarily harsh rulings and findings of fact. Br. of Appellant at 44. For the reasons discussed below, we hold that the juvenile court did not violate this doctrine.

1.      Legal Principles

Under the appearance of fairness doctrine a judicial proceeding is invalid if a reasonably prudent, disinterested observer would conclude that a party did not obtain a fair, impartial, and neutral hearing. *In re Marriage of Wallace*, 111 Wn. App. 697, 706, 45 P.3d 1131 (2002). Prejudice is not presumed, and some evidence must be presented of a judge's actual or potential bias. *Id*. This evidence of a bias can take the form of an independent investigation, *State v. Madry*, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972), or disparaging comments. *See In re Dependency of O.J.*, 88 Wn. App. 690, 697, 947 P.2d 252 (1997). The entire record should be considered cumulatively when determining if an observer would perceive bias. *See In re Disciplinary Proceeding Against Burtch*, 162 Wn.2d 873, 888, 175 P.3d 1070 (2008).

2.    Judicial Information System

JB, Sr. argues that the juvenile court's initiative in looking at the JIS made it appear biased or unfair. We disagree.

As discussed above, the juvenile court's examination of the JIS was not improper, because it was not acting under a misreading of the statute and sought and obtained consent from all parties before its examination of the JIS. In *Madry*, 8 Wn. App. at 63-66, 70, the trial court, while presiding over the defendant's criminal proceedings, actively investigated how frequently the defendant's hotel was involved with prostitution. The alleged prostitution had nothing to do with the charges against the defendant, yet the trial court relied on that investigative evidence in sentencing the defendant. *Id.* at 65-66, 70. Thus, the *Madry* court found that the appearance of fairness doctrine was violated. *Id.* at 70.

Here, the independent investigation aspect was not unfair because it allowed the parties to provide context to information within the JIS, required their consent, and generally did not introduce new issues before the court. In contrast with *Madry*, where the judge actively investigated matters completely divorced from the case at hand, the juvenile court simply sought clarification of the grandparents' past criminal and case histories that were already brought out in trial.

Accordingly, the juvenile court's use of the JIS did not create an appearance of bias or unfairness.

3.    Questioning of Grandparents

Next, JB, Sr. argues that the juvenile court's examinations of the grandparents created an appearance of bias. We disagree.

24

The juvenile court's questioning of AB and SB covered numerous topics. As to AB, the court highlighted (1) his inability to understand MV's status as a sexually aggressive youth; (2) his deception as to his qualification in the third-party custody action; and (3) his inability to comprehend the nature of a domestic violence no-contact order. As to SB, the court (1) pressed SB into stating that she lied to get the no-contact order; (2) pointed out that SB was willing to submit some materials to DSHS, but that she considered the personal statement a waste of time; (3) pressed SB to admit whether she believed MV was a safety risk; (4) highlighted SB's earlier testimony that the battery for MV's monitor had coincidentally died the night before; and (5) inquired into SB's refusal to allow DSHS to enter into her home without a witness when she simply could have used her phone to record the event.

Although we do recognize the juvenile court's extensive line of questioning and comments bordered on cross-examination, it did not reach the threshold to violate the appearance of fairness doctrine. In *Wallace*, 111 Wn. App. at 704-06, the court held that the trial court did not violate the appearance of fairness when it engaged in a brief line of questioning of the husband in a divorce proceeding. The court's questioning of the husband allowed it to clarify the legal implication of the husband's position, which would make valueless a piece of land the court was about to assign his wife. *Id.* at 704-05. The *Wallace* court reasoned that such an inquiry was proper because the court was just pointing out the "inevitable legal consequences of [the husband]'s position." *Id.* at 706.

In a similar vein as *Wallace*, the juvenile court's purpose was to clarify some of AB's and SB's earlier testimony rather than to impeach them. We agree that the juvenile court's actions approached the threshold of an appearance of fairness violation. However, a juvenile court must be afforded room to openly talk with families and get to the truth. In a proceeding that involved

25

determining whether the child's interest was best served by having the grandparents as guardians or terminating the parent-child relationship altogether, the juvenile court had a delicate and important task at hand. Given this context, bridling its ability to discern the truth may only have impeded its ability to determine what was in JB, Jr.'s best interests. Accordingly, this claim fails.

4.      Rulings and Findings of Fact

JB, Sr. contends that the juvenile court's rulings and findings of fact rose to the level of an appearance of bias or unfairness. We disagree.

The only comments that were questionable were the juvenile court's description of the grandparents' lack of credibility as "stun[n]ing," CP at 96, and its discussion of "pinn[ing]" SB down. RP (June 19, 2015) at 25. In *O.J.*, 88 Wn. App at 697, the trial court stated that leaving the kids with their mother would "handicap[]" them. In finding no appearance of fairness violation, the *O.J.* court focused on putting the potentially disparaging comment into context, which showed an "awareness of and sympathy" despite a strong finding against the mother. *Id.* Here, the juvenile court also recognized that the parents and grandparents "are family and that they love [JB, Jr.]." CP at 96. Consistently with *O.J.*, we believe any appearance of unfairness caused by the "stunning" and "pinning" comments was ameliorated by the court's demonstration of empathy for the grandparents.

Given this, and for the other reasons stated above, the juvenile court did not violate the appearance of fairness doctrine.

CONCLUSION

In the unpublished portion of this opinion, we hold that the juvenile court did not err in its findings or conclusions and that it did not violate the separation of powers or the appearance of

fairness doctrines. We decline to consider JB, Sr.'s contention that the juvenile court should

have considered JB, Jr.'s Indian heritage more broadly than the ICWA requires.

     For these reasons, and for the reasons set out in the published portion of this opinion, we

affirm.

                                       Bjorgen, C.J.

We concur:

Johanson, J.

Maxa, J.